**Pedro COLON c/o Daisy Flores, Plaintiff,**

**v.**

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 00 CIV. 3698(AKH).**

United States District Court,
S.D. New York.

March 7, 2001.

Matthew J. Chachere, Jeffrey S. Trachtman, Kramer, Levin, Naftails & Frankel, LLP, James M. Baker, New York City, for Plaintiff.

Pedro Conlon, Bronx, NY, Pro se.

Susan D. Baird, Mary Jo White, United States Attorney, New York City, for Defendant.

### MEMORANDUM AND ORDER (Vacating and Remanding Determination by Commissioner of Social Security)

HELLERSTEIN, District Judge.

This appeal, by a minor child through his parent, asks me to reverse a determination by the Commissioner of Social Security that plaintiff's alleged disability was not sufficiently severe to entitle him to Supplementary Security Income benefits. The Commissioner moved for summary judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and then withdrew the motion and substituted a motion to remand the matter to him for further review. Apparently, a medical report which he had considered was not previously shown to plaintiff for plaintiff's comment. Plaintiff cross-moved for judgment on the pleadings and, alternatively, for interim benefits pending the Commissioner's determination.

I hold, for the reasons discussed below, that the decision of the Commissioner is deficient, not only for the reason the Commissioner concedes, but also because of the Administrative Law Judge's basic failures to provide a meaningful hearing and a reasoned decision applying the statute and regulations to the conditions of this minor child. The Congressional amendments of

1996 and the implementing regulations of 1999, although substantially restrictive, did not eliminate Supplementary Security Income for disabled children. Nor did they relieve the Administrative Law Judge of the affirmative duty to develop a complete and fair evidentiary record, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996); *Echevarria v. Secretary*, 685 F.2d 751, 755 (2d Cir.1982), and to provide rational explanation relating his findings to the complete record. 20 CFR § 404, Subpt. P, App. 1, 12.00(C), (D) (1999).

I therefore reverse the Commissioner's determination, and grant the Commissioner's substituted motion to remand this matter pursuant to sentence four of 42 U.S.C. § 405(g), but upon the enlarged grounds set out in this decision, in order to permit review upon a complete record of the issues of disability. Plaintiff's motions for judgment and, alternatively, for interim benefits are both denied.

I write in order to summarize the changes made in 1996 by Congress and by the 1999 implementing regulations in the scheme for awarding Supplemental Security Income to disabled children, and to outline the factors that the Administrative Law Judge should have considered, but failed to consider.

## *THE RECORD IN THE SOCIAL SECURITY ADMINISTRATION*

Plaintiff, a minor child born May 18, 1990, filed for disability benefits on October 24, 1996. A 24-year old step-brother was learning disabled and was not working. Another half-brother was emotionally disturbed, and resided in a group home. His mother was "nervous," "obese," and "screams and threatens the children all the time." (R. at 135).

Plaintiff alleges that he suffered from severe attention deficiency hyperactive disorder, Tourette's syndrome, and other disabilities, including speech impairment, learning disabilities and psychiatric maladies. He had been rejected from kindergarten because of uncontrollable temper tantrums, throwing "all kinds of objects," yelling, screaming, and reporting "something in his head." (R. at 135). He was generally disobedient, fearful and prone to "uncontrollable tantrums." (R. at 150). After spending his kindergarten year at home, he was admitted in the fall of 1996 to a combined kindergarten and first grade class in special education. He could not identify simple words such as "cat," and was unable to spell his name, count beyond five, follow simple instructions, or repeat his address. (R. at 171). If asked to repeat three spoken words after five minutes, he was unable to do so without reminder-clues. His play with matches almost set fire to a mattress. He slept poorly, was fearful of being left alone or at school, and was restless while in the company of others. His academic skills were considered "too delayed" even for a special education setting, and he was recommended for a "full time small class setting for language/academic behavioral deficits with speech and language therapy and counseling." (R. at 96, 98).

Aided by a small class of 12, a structured setting, and therapy, plaintiff seemed to progress. He learned to count to ten, recognize colors, play with a computer, and seemed happy. (R. at 99). Short-term and long-term goals were set for him in a report dated November 14, 1996. To illustrate: by the following year, March and June, 1997, plaintiff was to demonstrate phonetic skills in identifying letters to pictures and objects, comprehension skills with respect to ideas and stories, library skills to find books, early writing skills by telling a story, counting skills in relation to series of words and objects, ability to read a clock, and other skills in relation to objects, seasons, body parts and more. (R. at 100–03.) The record does not indicate whether and to what extent plaintiff's development met those goals, or even if an inquiry was made in relation to such goals. (R. at 100). Plaintiff scored "low average" in IQ tests, but the record

contains no explanation of his score on the test or its taking.

Plaintiff's case of Tourette's syndrome manifested itself in repeated throat-clearing noises, but monthly visits to a neurologist and medication seemed to allay the noisome tic. (R. at 125). He was scheduled to visit a psychiatrist, Dr. Sotolongo, on July 10, 1997, but the record does not indicate a report of the visit until over a year later, on September 25, 1998, after the hearing.

Plaintiff's hearing before the Administrative Law Judge on September 18, 1998 was brief and uninformative. The hearing lasted but 20 minutes, opening at 10:30 a.m. and concluding at 10:50 a.m. No information was developed as to the extent of his learning and behavioral disabilities, or their cause, or whether improvements had been shown or were reasonably to be expected.

Plaintiff appeared pro se, by his mother. He was then in the second grade of special education. His mother testified that she took him once a week to a therapist and once every two weeks to a psychiatrist, and that he had recently changed his therapist, but the Administrative Law Judge failed to pursue what could be learned from either therapist or psychiatrist, or why the record before him failed to contain any report from either therapist or psychiatrist. The judge's questions about plaintiff's asthma from which plaintiff did not suffer, and about plaintiff's bilingual education when he did not attend bilingual education, suggested an unfamiliarity with the record that resulted in a failure to ask questions that might have elucidated the issues of impairment that had to be evaluated. Plaintiff's mother, Daisy Flores, testified that plaintiff yelled and cried for any little thing, blamed others for telling him to be bad in school, set a mattress on fire, fought with other kids, ignored his teachers, feared the dark, threatened to kill himself, and ran around aimlessly to the point of even falling down a flight of stairs, but the Administrative Law Judge asked no questions to evaluate the information given to him. Ms. Flores described a medication that was given to her son, and told the judge that "sometimes [it] don't even work" and that "different medication . . . doesn't really do much," (R. at 34), but no questions were asked to learn the type of medication, or the substitute medication, or even if the medication was to allay the throatclearing-tic associated with plaintiff's Tourette syndrome, or to combat plaintiff's hyperactivity and behavioral problems.

The Administrative Law Judge closed the hearing twenty minutes after he opened it, asked Mrs. Flores to submit an identification of plaintiff's medications, and said that he would read the report of the psychiatrist, Dr. Sotolongo.

Dr. Sotolongo's evaluation (presumably, a consultative examination),[1] dated July 31, 1997, was issued by Bronx–Lebanon Hospital's Department of Psychiatry on September 25, 1998, more than a year after the visit on which it reported.[2] (R. at 192). Based on the patient-history given by plaintiff's mother as to plaintiff's hyperactivity, anxiety, and behavioral conditions along the lines already described, and without any reference to prior school, psychiatric or neurological records, Dr. Sotolongo reported, by checking relevant categories on a pre-printed form, as follows:

---

**1.** A consultative examination is ordered to "resolve a conflict or ambiguity," or "secure needed medical evidence the file does not contain such as clinical findings, laboratory test, a diagnosis or prognosis necessary for decision." 20 C.F.R. § 404.1519a (1991). If the report is not adequate—for example, if it does not assess all the reported impairments and complaints described in the medical history—the consultative physician is to be contacted to furnish the missing information. *See id.* at § 404.1519p.

**2.** Plaintiff's visit to Dr. Sotolongo on July 31, 1997 was presumably the same visit as the July 10, 1997 visit previously mentioned. The ALJ did not clarify the discrepancy.

| CATEGORIES ON FORM | REPORTED OBSERVATIONS |
|---|---|
| Physical Appearance: | Appears chronological age |
| Motor Behavior: | Overactive, Fidgety |
| Speech Behavior: | Speech clearly articulated |
| Relatedness: | Relates well to the interviewer, Cooperative, Good eye contact |
| Mood–Affect: | Normal range mood |
| Suicidal/Homicidal ideation/potential: | No suicide or homicidal ideation or planning |
| Thought and Perception: | No abnormalities in thought content or process |
| Language: | Adequate receptive and expressive language |
| Cognitive Functioning (when applicable): | Low Average |
| Characteristic of Play (when applicable): | Spontaneous, goal directed, creative and appropriate for age. |

(R. at 192–97). Dr. Sotolongo summarized his observations by stating that he was not clear "whether patient is suffering from ADHD or anxiety or both;" that plaintiff's mother needed "to acquire better techniques to set limits on plaintiff's behavior;" that "parent training" was needed; and that the severity of plaintiff's condition, on a scale of one to six, "none" to "catastrophic," was three, or "moderate," that is, more than "mild," but less than "severe," "extreme," or "catastrophic." (R. at 197).[3]

### THE COMMISSIONER'S DECISION

The Administrative Law Judge determined, in his opinion dated February 24, 1999, that plaintiff was not disabled. (R. at 13–21). The ALJ found that although plaintiff's condition of Tourette's syndrome and attention deficit hyperactivity disorder were "severe" impairments, in that they were more than "slight abnormalities" and caused "more than minimal functional limitations," *id.* at 15, they nevertheless did

not meet or equal the conditions set out in the Listings of impairments provided by the regulations, and thus did not by themselves constitute a qualifying disability. The ALJ then proceeded to evaluate plaintiff's functional capacities in the several broad areas of functioning provided by the regulations, in order to ascertain if plaintiff's impairments were the equivalent of a Listing—in the areas, that is, of cognition/communication; motor; social; personal development; and concentration, persistence or pace.[4] The issue, as the ALJ expressed it in relation to the facts at bar, was whether plaintiff's condition resulted in "extreme" limitation of functioning in one area of functioning, or "marked" limitation of functioning in two areas of functioning. (R. at 15 (*citing* 20 C.F.R. § 416.926a(b)(2))). Referring to the regulations, the ALJ ruled that the definition of an "extreme" limitation of functioning is where there is "no meaningful functioning

---

3. Several of the reported diagnoses are abbreviated. I could not understand them, and the record did not provide translations.

4. These functional domains, the Listings of impairments, and other aspects of the relevant law and regulations are discussed later in this opinion.

in a given area"; a "marked" limitation of functioning is where one or several activities or functions are limited "such as to interfere seriously with the child's functioning," and the limitation is " 'more than moderate' and 'less than extreme.' " *Id.*

The ALJ then turned to each of the areas, or "domains," with regard to which plaintiff's impairments were to be evaluated, first setting out the criteria provided in the regulations, and then making determinations as to plaintiff's impairments. For cognition/communication, the ALJ noted that plaintiff's impairments were to be measured with regard to his ability to learn, understand and solve problems; the ability to retain and recall information; the ability to communicate and to exchange information and ideas with peers and family "in a spontaneous, interactive, sustained, and intelligible manner, using increasingly complex vocabulary and grammar," and the like. The ALJ then concluded that "[t]he claimant has moderate but less than 'marked' limitation of functioning." (R. at 20).

The ALJ gave his reasons:

The claimant ... receives special education instruction ... and underwent psychiatric evaluation on November 7, 1996 ... [at which] the claimant had difficulty sitting still ... [and] difficulty articulating ... [h]owever, he expressed himself in a goaldirected manner. He had difficulty performing simple computations and following simple instructions. Insight and judgment were impaired and intellectual functioning appeared to be in the low-average range.

The ALJ's finding, that plaintiff "expressed himself in a goaldirected manner," had been stated in a report of a psychiatric consultation of November 7, 1996. (Report, Dr. Renee David, R. at 170). The reported observations, however, provided a contradictory context: "difficulty articulating," "crying and screaming in class," "punching and hitting teachers," and "restless[ness]" and "difficulty sitting still"— "hyperactivity, nervousness, tearfulness,

and prone to uncontrollable tantrums"; "difficult to understand." Although "no delusional thinking" and "no evidence of perceptual disturbance" was found, plaintiff was unable to identify simple letters, spell his name forward, recall without clues any of three words in five minutes, perform simple computations, or following simple instructions. The report found his insight and judgment to be impaired, and found he suffered from "low-average intellectual functioning." The diagnosis reported "oppositional defiant disorder" and "expressive language disorder," with need to "rule out" ADHD, "mixed receptive and expressive language disorder," and "reading disorder," and recommended psychological and standardized academic testing and detailed school reports to confirm the impression of ADHD, and psychological treatment and stimulants and behavioral therapy to improve his condition. The prognosis was reported as "fair." (R. at 170–72).

The ALJ did not relate his finding, "expressed himself in a goal-directed manner," to the history, observations, diagnosis and prognosis of the psychiatrist's report. The apparent inconsistency between the ALJ's finding of goal direction and plaintiff's behavioral impairment problems was not explained. (R. at 17–18). Nor did the ALJ give any explanation why his finding was "moderate but less than 'marked.' "

As to the second broad area, motor functioning, the ALJ determined:

[T]he claimant has moderate but less than 'marked' limitation of functioning. He has Tourette's syndrome for which he has been prescribed Clondine. The claimant has a verbal tic wherein he frequently makes a noise like clearing his throat; however, this is not a constant tic.

(R. at 18). There is no mention of plaintiff's other "motor" problems: his aimless running, his falling down stairs, his restlessness, and the like. The ALJ failed to

discuss plaintiff's ability "to use fine and gross motor skills . . . in normal mobility, school work, play," etc., the criteria provided by the regulations. It is impossible to understand from the ALJ's decision why his classification should be "moderate" or "marked," or something in between. The ALJ gave no reasoned explanation.

With regard to social functioning, the opinion follows the same course: a discussion of the regulations, followed by a reference to plaintiff's mother's statement that plaintiff had temper tantrums and tried to set fire to a mattress, and then the conclusion that "the claimant has moderate but less than 'marked' limitation of functioning." Again, there is no discussion attempting to rationalize the finding and explaining its apparent inconsistency with the criteria provided by the regulations: the ability to play alone, with another child, and with a group; to develop friendships; to respond to social environments through increasingly complex interpersonal behavior; and to relate appropriately to individuals and groups, including with parents, teachers and social groups. The ALJ gave no reason why plaintiff's social functioning should be classified as "moderate" or "marked" or "extreme."

In the area of personal development, involving issues of personal hygiene and care, the ALJ found no limitation of functioning. (R. at 19). The finding does not appear to have been contested.

Finally, in the area of concentration, persistence and pace, a domain that evaluates a child's ability to sustain an activity for a period of time and at a reasonable pace, the ALJ first noted plaintiff's diagnosis of attention deficit hyperactivity disorder (ADHD) and teachers' reports of "problems with impulse control and distractibility," and concluded, without analysis or discussion, that the impairments were but "moderate" and "less than marked" limitations of functioning. (R. at 19–20).

The opinion concluded: "the claimant does not have 'marked' or 'extreme' limita-tions in any area of functioning," and therefore, because he does not have " 'extreme' limitation in one area of functioning or 'marked' limitation in two areas," claimant cannot be considered "disabled." (R. at 20). Accordingly, even though plaintiff's ADHD and Tourette's syndrome were "severe" impairments as defined at 20 C.F.R. § 416.924(c), the impairments thereby caused were "not of a severity which medically meets or equals the severity of a listed impairment" or was "functionally equivalent in severity" to such a listed impairment. (R. at 20–21). Plaintiff's "subjective complaints," since they were "not supported by the evidence of record," cannot be considered "credible." (*Id.*) Accordingly, plaintiff was considered ineligible for Supplemental Security Income.

## STATUTORY AND REGULATORY DEVELOPMENT

Social Security payments to disabled children were introduced in 1972 as part of a basic restructuring by Congress of the national welfare system. By amendment to the Social Security Act, a Supplemental Security Income program was enacted to provide supplementary income benefits to eligible aged, blind or disabled individuals whose income did not exceed a stipulated threshold. Pub.L. 92–603, 86 Stat. 1329 § 301 (1972), *reprinted in* 1972 U.S.C.C.A.N. 1548, 1722, 42 U.S.C. § 1382. Congress considered "disabled children who live in low-income households as among the most disadvantaged of all Americans," "deserving of special assistance in order to help them become self-supporting members of our society." House Report No. 92–231 recommending Pub.L. 92–603, *supra,* 1972 U.S.C.C.A.N. at 5133–34.

Disability was defined as an incapability to engage in "any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (1972). The physical or mental impairment had to result from "anatomical, physiological, or psychological abnormalities," and had to be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 1382c(a)(3)(C). Furthermore, the disability had to be of such severity that the individual was unable not only to do his previous work but, "considering his age, education, and work experience," also could not "engage in any other · kind of substantial gainful work which exists in the national economy." *Id.* at § 1382c(a)(3)(B). "[T]he combined effect of all of the individual's impairments" were to be considered, "without regard to whether any such impairment, if considered separately, would be of such severity" as to qualify for Supplementary Security Income benefits. *Id.* at § 1382c(a)(3)(F).

The statute did not provide criteria for determining disability of children. Although children were not part of the national work force, a child, according to the statute, was to be considered disabled, for purpose of eligibility to receive Supplemental Security Income, if his "medically determinable physical or mental impairment" was of "comparable severity" to that of an adult. 42 U.S.C. § 1382c(a)(3)(C) (1972). The Congressional purpose, as reflected in the House Report, was to provide benefits to disabled children while they were children, and because their needs were "often greater than those of non-disabled children," thus "enabling them, as among the most disadvantaged of all Americans, to enter society as self-supporting members." H.R.Rep. No. 92–231 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5133–34; *see Maldonado v. Apfel,* 55

F.Supp.2d 296, 307 (S.D.N.Y.1999); *Harris v. Apfel,* 209 F.3d 413 (5th Cir.2000).

The regulations provided a five-step sequential evaluation process for determining disability. *See* 20 C.F.R. § 416.925 (1989). The first two steps involved an inquiry into the loss of work and the extent and duration of an impairment. The third step inquired if the medical evidence of impairment matched or was equal to a Listing of impairments that were presumed severe enough to preclude any gainful work. If the applicant was an adult and did not qualify through this third step, two more steps were provided to determine, functionally, if his impairment prevented him from doing his own past work or any other work available in the national economy in view of his age, education and work experience.

There was no provision for a fourth or fifth inquiry-step for children. A child was to be considered disabled, pursuant to the pre–1990 regulations, only if the medical evidence of the child's impairments matched or was equal to a Listing.[5]

In *Sullivan v. Zebley,* 493 U.S. 521, 528, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), the Supreme Court held that the "comparable severity" standard provided by the Act required regulations providing for functional evaluations of children's impairments as well. Children as well as adults, the Supreme Court held, were entitled to individualized functional assessments of impairments, comparable to the process used in the fourth and fifth steps for adults. Thus, in order to determine if a child's impairment was of "comparable severity" to that which would cause an adult to be considered disabled, the Social Security Administration was required to evaluate the impact of the child's impairment on his normal daily activities in order to determine if the impairment was comparable

**5.** The regulations listed 125 impairments for adults, and an additional 57 for children. Most Listings pertained to body system categories but, for adults, neurological impairments and mental disorders as well, and, for children, an additional category for growth

impairment. The requirement that applicants be given individualized functional assessments meant that the Social Security Administration had to consider impairments beyond the Listings. *See* 20 CFR § 404, Subpt. P, App. 1 Parts A, B (1989).

to that causing an adult to be incapable of performing any kind of substantially gainful work.

Both for adults and for children, the medical criteria that defined the listed impairments, the Supreme Court observed, imposed a standard higher than the statute required. Thus, if an applicant satisfied the Listings, the applicant was presumed to be disabled, and did not have to prove "whether he actually can perform his own prior work or other work." This methodology served to "streamlin[e] the decision process." *Id.* at 532, 110 S.Ct. 885 (*quoting Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). But the Listings were intended to include only "the more common impairments" and, for children, "a means to efficiently and equitably evaluate the more common impairments." *Id.* at 535, 110 S.Ct. 885. The Listings-only approach, the Supreme Court observed, disregarded many factors. Some impairments, for example multiple impairments, could be severe, yet were not readily capable of being measured by the clinical tests required under the Listings. *Id.* at 535 n. 17, 110 S.Ct. 885.

The Supreme Court dismissed the argument that "since children do not work[,] there is no available measure of their functional abilities analogous to an adult's ability to work [other than] to compare child claimants' medical evidence with the standard of severity set by the Listings." *Sullivan*, 493 U.S. at 538, 110 S.Ct. 885. The Supreme Court ruled that no "fixed, finite set of medical criteria can respond adequately to the infinite variety of medical conditions and combinations thereof, the varying impact of such conditions due to the claimant's individual characteristics, and the constant evolution of medical diagnostic techniques." *Id.* Accordingly, the Supreme Court ruled that there must be

[a]n inquiry into the impact of an impairment on the normal daily activities of a child of the claimant's age—speaking, walking, washing, dressing, feeding oneself, going to school, playing, etc.—[and that such an inquiry] is, in our view, no more amorphous or unmanageable than an inquiry into the impact of an adult's impairment on his ability to perform "any other kind of substantial gainful work which exists in the national economy."

*Id.* at 540, 110 S.Ct. 885 (citations omitted).

The Commissioner issued revised regulations in 1991 and again in 1993, providing for an evaluation according to the criteria required by *Sullivan v. Zebley.* If the child's impairment met or equaled a disability Listing, the child qualified for SSI, as previously. If the child's impairment did not meet or equal a Listing, the child could now also qualify for SSI if an individualized assessment of the effect of the child's impairments showed that the child was not able to function "independently, appropriately, and effectively in an age-appropriate manner." 20 C.F.R. § 416.924(a) (1993).

In 1996, Congress tightened the definition of disability to limit Supplementary Security Income ("SSI") to those "needy children who had severe disabilities." *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. 104–193, 110 Stat. 2105 (Aug. 22, 1996); H.R. Conf. Rep. No. 725, 104th Cong., 2d Sess. 328 (1996), 1996 U.S.C.C.A.N. 2649, 2716. A child, in order to qualify, had to have (a) a "medically determinable physical or mental impairment," (b) "expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," and (c) resulting in "marked and severe" functional limitations. *See* 42 U.S.C. § 1382c(a)(3)(C) (1996).[6] Congress per-

---

6. As with the previous law, the evaluation was to consider "the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered

separately, would be of [requisite] severity" to qualify for SSI benefits. 42 U.S.C. § 1382(a)(3)(G).

ceived that the 1972 Act, as interpreted by *Sullivan v. Zebley*, made it too easy to fabricate testimony and feign disability, and that SSI promoted a condition of welfare-dependency furthering illegitimacy and causing emotional and behavioral problems in children. *See* H.R. Conf. Rep. 104–651 at 3, Intro. to Welfare and Medicaid Ref. Act of 1996, 104th Cong., 2d Sess. (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2184. Congress sought "to better target benefits for children who are disabled," and also "to combat increased abuse of the SSI program" by changing the eligibility of children for SSI benefits. The Committee intended that "functional assessments" resulting in findings of "age-inappropriate behavior" would no longer qualify for benefits, for the evidence of such was "particularly prone to abuse." H.R. 104–651 at 1323, 1996 U.S.C.C.A.N. at 1323. The functional limitations, taking into account the combined effects of all physical or mental impairments of the child, would have to be "marked and severe" as defined by specific criteria reflected in a modified set of Listings, and would no longer be an alternative to the Listings. *Id.* at 1323, 1385, 1996 U.S.C.C.A.N. at 2382, 2444. The House Report stated its intention that:

"[O]nly needy children with severe disabilities be eligible for SSI";

"[T]he Listings and other disability determination regulations...properly reflect the severity of disability contemplated by the statutory definition";

"In those areas of the Listings that involve domains of functioning, ...no less than marked limitations in no fewer than two domains or extreme limitations in at least one domain [shall be] the standard for qualification."

Id. at 1385, 1996 U.S.C.C.A.N. at 2444. Congress warned that the Listings are not to include "maladaptive behavior" among the criteria for evaluating mental and emotional disorders in the domain of personal/behavioral function. Congress found "particular troubling" the reports of "coaching" of testimony and "generally broadened eligibility criteria" resulting in "explosive growth in enrollment and mounting costs to taxpayers"—an approximate trebling of enrollment in six years and quadrupling of expense, to $4.8 billion in 1995. *Id.* at 1386, 1996 U.S.C.C.A.N. at 2445.

The 1996 statute was to apply to both pending and newly-filed applications. *See* H.R. 104–193 at 1386, 1996 U.S.C.C.A.N. at 2445. Congress directed the Commissioner to prescribe implementing regulations to reflect its changed intent. The implementing regulations were to be submitted to Congress at least 45 days before they were to become effective. *See* H.R. Conf. Rep. No. 725, 104th Cong., 2d Sess. 328 (1996), 1996 U.S.C.C.A.N. 2649, 2716.[7]

The Commissioner promulgated interim final regulations on February 11, 1997. *See* 62 FR 6408 (Feb. 11, 1997), *corrected at* 62 FR 13537 (Mar. 21, 1997) *and* 62 FR 36460 (July 8, 1997). The regulations have now become final. *See* 65 FR 54747. Under the regulations, a "marked and severe functional limitation"—the statutory standard for disability—requires that the child's impairment meets, medically equals, or functionally equals the severity of a Listing. *See* 20 C.F.R. § 416.924(b), (c) and (d) (1998). Functional equivalence has to be found, not according to the general standard required by *Sullivan v. Zebley*—ability to function "independently, appropriately, and effectively in an age-appropriate manner"—but according to the degree that the child's impairment limits the child as to specific enumerated functions, or in broad areas of development or functioning, or because of episodic impairments, or because of the effects of treatment or medication. *See* 20 C.F.R. § 416.926a(b) (1998).

---

7. The 1996 amendments were to be applied to "any individual who applies for, or whose claim is finally adjudicated with respect to benefits ... on or after ... [Aug. 22, 1996]." 1996 U.S.C.C.A.N. at 2716. Hence, this case is governed by these amendments.

The Listings describe medical conditions of impairment that are considered "severe enough to prevent an adult from doing any gainful activity," and to cause "marked and severe functional limitations" in a child. 20 C.F.R. § 416.925(a) (1999). They are set out in two categories: an "A" category for adults and, to some extent, children; and a "B" category for children under 18. *See* 20 C.F.R. § 404, Subpt. P, App.1, Part A, B (1999). Generally, a child's impairments are of Listing-level severity if they cause "marked limitations" in at least two broad areas of functioning, or "extreme limitation" in at least one such area. *Id.* at § 416.925(b).

One such Listing treats neurological and mental disorders. *See* 20 C.F.R. § 404, Subpt. P, App. 1, 12.00 (1999). Twelve subcategories of this disorder are set out for children: mood disorders, mental retardation, anxiety disorders, tic disorders, personality disorders, attention deficit hyperactivity disorders, and others. *See Id.* at 112.00. Information from medical and non-medical sources is to be gathered, relating to "a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity" according to a "longitudinal" evaluation, an evaluation, that is, over time. *Id.* at 12.00(D). Scores on objective tests are to be evaluated in narrative fashion, relating the scores to the individual's history. *Id.* Observations and reports of teachers and school nurses are considered excellent sources of information, "and should always be sought for school age children," for they "establish a longitudinal picture that cannot be established through a single purchased examination." *Id.* at 112.00(C), (D). The goal is to "identify the child who cannot adequately function in primary school because of a mental impairment." *Id.* at 112.00(C)(3).

The child's impairments are evaluated for severity in five functional areas: motor functions; cognitive/communicative functions; social functions; personal functions; and concentration, persistence, or pace functions. 20 C.F.R. § 404, Subpt. P, App. 1, 112.00(C) (1999). The regulations provide characteristics of disability in each area, with severity evaluated by the "medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available)." *Id.* at 112.02(B)(2). If this medical evidence shows that the impairment "seriously interfere[s] with the [child's] ability to function independently, appropriately and effectively," the impairment is considered "marked." *Id.* at 12.00(C); § 416.926a(c)(3)(C). If the medical evidence shows that there is no "meaningful functioning in a given area," the impairment is considered "extreme." *Id.* at § 416.926a(c)(3)(ii)(C).[8] If, after consideration of all relevant information relating to all relevant areas, the child's impairment is classifiable as "extreme" in at least one area or "marked" in at least two areas, the child may be considered "severely" disabled and qualify for SSI. *Id.* at § 416.926a(c).

These conclusions are to be reached in accordance with "medical findings" and documented behavioral limitations.[9] If, after consideration of such evidence, the child's impairments are not deemed to meet, or medically equate to, a Listing, 20 C.F.R. § 416.926 (1999), the Commissioner is instructed to examine the child's be-

---

8. The regulations also define a "moderate" limitation of function as a limitation less than "marked." 20 C.F.R. § 416.926a(c)(3)(i)(C).

9. The decision whether an impairment is medically equal to a listed impairment is to be based "on medical evidence only" supported by medically acceptable clinical and laboratory diagnostic techniques, and considering also the medical opinion of a consultant designated by the Commissioner. 20 C.F.R. § 416.926(b) (1999). This suggests a standard higher than that described above, instructing that the medical findings include consideration of historical and other information from parents, teachers and others who know the child.

havioral limitations to ascertain if they are functionally equivalent to a Listing— to ascertain, that is, if "what a child cannot do as a result of an impairment ... produces marked and severe functional limitations." *Id.* at § 416.926a(a). The limitation must have "a direct, medically determinable cause." *Id.* The child's limitations are to be evaluated with regard to specific functions like walking or talking, or with regard to the same broad areas of development or functioning as previously discussed: motor functions; cognitive/communicative functions; social functions; personal functions; and concentration, persistence, or pace functions. *See id.* at § 416.926a(c)(4); § 416.926a(c)(5)(E)(iv). If a child's limitations are "extreme" in one area of functioning, or "marked" in two areas of functioning, the child qualifies as disabled and is eligible to receive SSI.[10] *Id.* at § 416.926a(b).

The regulations again define "extreme" and "marked" limitations. If a standardized test is available, a score of functional ability that is two standard deviations below the norm is to be considered "marked"; if three or more standard deviations below the norm, the limitation is to be considered "extreme." 20 C.F.R. § 416.926a(c)(3)(A). If a standardized test is not appropriate, the child's behavioral limitations are evaluated: a "marked" limitation for children between the ages of three and eighteen is one that "interfere[s] seriously with the child's functioning." *Id.* at § 416.926a(c)(3)(C). If there is no "meaningful functioning in a given area," the limitation is considered "extreme." *Id.* at § 416.926a(c)(3)(ii)(C). This evaluation is to be done in each of the five broad areas of development, and in the interrelationships of impairments among the five areas, on the basis of "all relevant information in the case record." *Id.* at § 416.926a(c)(2). As the regulations state, "[w]e will consider the effects of [an appli-

cant's] impairment in all relevant areas in which [the applicant has] limitations from the impairment(s)." *Id.*

The regulations describe the traits of the child that are to be evaluated in each of the five broad areas of development. The cognition/communications function concerns the child's ability to learn, understand and solve problems; to retain and recall information; to comprehend and produce language in order to communicate, respond to questions, follow directions, share information, and express feelings and ideas—all "in a spontaneous, interactive, sustained, and intelligible manner, using increasingly complex vocabulary and grammar." 20 C.F.R. § 416.926a(c)(5)(E)(iv)(A) (1999).

The child's social function concerns the child's ability to form and maintain individual and group relationships with parents, siblings, neighborhood children, classmates and teachers, and to respond appropriately to persons in authority. It involves ability to play alone, to form friendships, to engage in cooperative behavior, to show consideration for others, and to be aware of others' feelings, to have a social maturity appropriate to the child's age, and not to run away from others, engage in physical aggressive behavior, or engage in inappropriate externalized action. *Id.* at § 416.926a(c)(5)(E)(E)(iv)(C).

The function of concentration, persistence, or pace evaluates the ability to sustain concentration on an activity or task, and to complete the task at a reasonable pace. *Id.* at § 416.926a(c)(5)0(E)(iv)(E). And so on.

The regulations also instruct administrative law judges as to the evidence that they are to consider. Medical opinions from physicians or psychologists, reflecting judgments about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, are to be considered "together with the rest of

---

10. The regulations provide also for impairments that are episodic and that result from treatment or medication. 20 C.F.R. § 416.926a(b)(3) (1999).

the relevant evidence." 20 C.F.R. §§ 416.927(a)(2), (b) (1999). If the medical opinions are inconsistent with other evidence, all the evidence is to be weighed. *Id.* at § 416.927(c)(2). More weight is to be given to a source that has treated the person claiming disability than to "abstract" opinions, for they are most able to provide a "detailed, longitudinal picture of [the applicant's] medical impairment(s)" that cannot be obtained from the "objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* at § 416.927(a)(2). Regarding the weight of a medical opinion, the more the opinion rests on "relevant evidence," and the "better an explanation a source provides for an opinion," the more weight to be given to that source of opinion. *Id.* at § 416.927(c)(3). The more consistent a source is with all the evidence, the more weight that it should be given. *Id.* at § 416.927(c)(4). Symptoms must be "carefully consider[ed]," including information from educational agencies and personnel, statements from parents and other relatives, and evidence submitted by social welfare agencies, therapists, and other practitioners, for they can suggest a greater severity of impairment than can be shown by objective medical evidence alone. *Id.* at § 416.929(c)(3).

The Social Security Act requires that this entire methodology be applied to the whole child, with respect to each impairment and to the combined effect of all the child's impairments:

In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. § 1382c(a)(3)(G). The Commissioner has implemented this mandate in regulations. *See, e.g.,* 20 C.F.R. § 416.906 (1998) ("If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations..."); 20 C.F.R. § 416.924(a)(1998) ("If you allege more than one impairment, we will evaluate all the impairments for which we have evidence. Thus, we will consider the combined effect of all your impairments upon your overall health and functioning."); 50 FR 8729 (Mar. 5, 1985) ("we will consider the combined effect of all your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity").

## Discussion

The causes and explanations of a young child's behavioral limitations are not readily discernible. Young children are not able to analyze themselves or intelligently explain their behavior. This young child, Pedro Colon, the plaintiff, a ten-year old at this writing and a six-to-eight -year old when the record before me was developed, was not asked to account, and did not account, for his tantrums, for setting a mattress on fire, for fighting with his peers and ignoring his teachers, for his inability to count, or remember, or tell letters, or for his being rejected from kindergarten class.

The functional assessments provided by the regulations compensate for this inability of a child to explain himself. In many dysfunctional and impoverished homes, little help is provided by a parent or caregiver, especially one that is overwhelmed by her own limitations and problems. That may be why the administrative law judge

is required to gather information from both medical and non-medical sources, and for a sufficiently long period prior to the date of adjudication to enable a "longitudinal" evaluation of a child's impairments. *See* 20 C.F.R. § 404, Subpt. · P, App. 1, 112.00 (1999). If objective tests are available, they should be used, but even if used, the administrative law judge is required in narrative fashion to analyze and explain the results and relate them to the child's history. *Id.* Observations and reports of teachers and school nurses are considered excellent sources of information, "and should always be sought." *Id.*

 Clearly, the Administrative Law Judge below failed to exhibit an understanding of the record developed for Pedro Colon, or relate his findings to the record, or keep the record open to include answers to the development questions posed by plaintiff's special education teachers. It does no good to recite a history related by parents and teachers, and then to ignore that history when expressing findings. Findings are not rationally based on the evidence when they do not fairly relate to the credible evidence.

It is no answer that the Administrative Law Judge extracted certain conclusions of the consulting psychiatrist, Dr. Sotolongo, that were not themselves grounded in Pedro Colon's history. The regulations instruct that medical opinions are to be considered "together with the rest of the relevant evidence" and, if inconsistent with that evidence, "all the evidence is to be weighed." 20 C.F.R. § 416.927(a)(2), (b), (c) (1999). A "detailed, longitudinal picture" is given greater value than reports of individual consultative examinations. *Id.* The "better" the explanation in relation to the longitudinal evidence and the greater the consistency, the more the weight that should be given to the consultant's opinion. *Id.* at § 416.927(c)(3), (4). Information from educational agencies and personnel, statements from parents and relatives, and evidence from social welfare agencies, therapists and other practitioners can be as, or more, persuasive than objective medical evidence alone. *Id.*

The Commissioner's opinion in this case utterly failed to satisfy the mandate of the statute and regulations. The Commissioner's opinion merely restated the regulation applicable to each separate category of functioning, followed by a brief and conclusory statement that the plaintiff's limitation in that category of functioning was "less than marked." There was no evaluation of specific traits of conduct, nor of limitations, nor consideration of how such conduct or limitation may, or may not, have affected the plaintiff's capabilities in the broad developmental areas of cognition/communication, motor, social, personal development, and concentration, persistence or pace. Merely to assign conclusory labels of "extreme," "marked" or "moderate," without the "longitudinal picture" required by the regulations and supporting analysis, is not helpful to understanding.

It will be the Administrative Law Judge's task, on remand, to develop and consider all the relevant evidence, and not simply cull convenient extracts from a consultant's report. The findings to be made by the Administrative Law Judge, whether Pedro Colon's impairments are "extreme," or "marked," or "moderate," must be related to all the relevant evidence. Conclusory findings without explanation and analysis have little or no value.

 A Social Security benefits hearing is considered to be non-adversarial. *See Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996). The Social Security Commissioner, and administrative law judges carrying out the Commissioner's adjudicative functions, have an affirmative duty to develop an evidentiary record that is complete and fair. *See id.; Echevarria v. Secretary of Health and Human Services,* 685 F.2d 751, 755 (2d Cir.1982). If an applicant is not represented by counsel, the duty of the administrative law judge is particularly acute, *see id.* at 755, especially if the claimant is an infant. *See Marquez*

*o/b/o Infante v. Shalala*, 898 F.Supp. 238, 241 (S.D.N.Y.1995). The ALJ is under a "heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Echevarria*, 685 F.2d at 755; *see generally*, Jon C. Dubin, *Torquemada Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine to Administrative Proceedings*, 97 Colum. L.Rev. 1289, 1302–05 (1997). *See also Rivera v. Apfel*, 99 F.Supp 2d 358 (S.D.N.Y.2000).

■ Plaintiff argues that the regulatory scheme of one "extreme" or two "marked" limitations of functioning is arbitrary and should be stricken or, if not stricken, satisfied by a cumulative scoring of three or more "moderate" limitations of functioning. Further, plaintiff argues, the whole child, in all aspects of the child's behavioral limitations, must be evaluated and if, upon such overall evaluation the child's limitations are found to be "marked and severe," the child should be entitled to SSI payments to reflect that he is disabled.

Findings of disability in adults are made easier by a certain objectivity in the analysis, whether the adult became unable to perform the job he had and could not engage in any other kind of substantially gainful work in the national economy. That set of standards is not available to evaluate disabilities of young children. Congress thus provided an alternate criterion, whether the medical or physical impairments of a child caused "marked and severe" functional limitations of a certain duration. *See* 42 U.S.C. § 1382c(a)(3)(C) (1996). The Conference Report, elaborating on the criterion, stated that the regulations to be promulgated by the Commissioner of Social Security should provide that one "extreme" or two "marked" limitations would be necessary for a child to qualify under the "marked" and "severe" standards.

■ Clearly, Congress has the right to qualify the entitlements it provides, and clearly Congress has done so. Congress

may itself set the standards, or delegate that task to an agency under guidelines provided by the enabling and delegating legislation. The 1996 Amendments to the Social Security Act provide the standards and the guidelines, partly in the Act itself and partly in the Conference Report recommending the legislation. I find no impropriety in this methodology.

Defendant, the Commissioner of Social Security, argues that the regulations legitimately implement the statute and should be upheld as permissible statutory construction. Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which requires a reviewing court to defer to any reasonable construction of a statute by an administrative agent responsible for its interpretation, I am compelled to uphold the Commissioner's regulations. *See also Whitman v. American Trucking Associations*, 531 U.S. 457, 121 S.Ct. 903, 917, 149 L.Ed.2d 1 (2001).

I do so, however, provisionally, pending further review of a complete record and a rationally based determination of plaintiff's claims of impairment. As I have discussed, the record developed below and the opinion of the Commissioner with respect to plaintiff-child's application do not adequately meet the burden on the Commissioner to compile a complete record and to grant a full and fair hearing to a petitioner for SSI benefits.

■ Accordingly, I vacate the determination of the Commissioner and remand this matter for further proceedings not inconsistent with this opinion. As to plaintiff's motion for interim benefits, I am not able to find on the record before me and at this time, and in light of the likelihood of a prompt hearing on remand, that plaintiff has adequately shown the requisite degree of probability of success and irreparable damage to justify such relief, *see Rivera v. Apfel*, 99 F.Supp.2d 358 (S.D.N.Y.2000), and I therefore deny the motion. Plaintiff is given leave to file a petition seeking

such relief if such relief becomes justified in changed circumstances.

SO ORDERED.